Marcus T. BAUMANN,
Petitioner-Appellant,

v.

UNITED STATES of America,
Respondent-Appellee.

No. 81–5380.

United States Court of Appeals,
Ninth Circuit.

Submitted Nov. 12, 1981.

Decided Oct. 27, 1982.

567

Marcus T. Baumann, in pro per.

Susan A. Ehrlich, Asst. U. S. Atty., Phoenix, Ariz., for respondent-appellee.

Appeal from the United States District Court for the District of Arizona.

Before WALLACE, KENNEDY, and PREGERSON, Circuit Judges.

WALLACE, Circuit Judge:

Baumann appeals the district court's summary dismissal of his petition seeking postconviction relief pursuant to 28 U.S.C. § 2255. He contends that the district judge erred in failing to order an evidentiary hearing on his claims of newly discovered evidence and prosecutorial suppression of *Brady* material, that the indictment under which he was charged was improperly drawn, that the use at his sentencing of the results of a presentence interview with a federal probation officer violated his rights

under the sixth amendment and *Miranda,* and that his conviction was the product of ineffective assistance of trial counsel. We affirm in part, reverse in part, and remand for an evidentiary hearing on certain of these claims.

## I

On January 12, 1977, Baumann was indicted, along with fifteen other persons, on four counts of mail fraud and aiding and abetting, 18 U.S.C. §§ 1341, 2, arising out of the activities of Western Land Sales Co. (Western), a corporation which fraudulently sold what are referred to as "fenceposted" land sale contracts. Baumann was tried jointly with four other defendants in May of 1977. Hood, the president of Western, pleaded guilty to mail fraud and served as the government's chief witness at trial. Baumann was convicted on all four counts and his conviction was affirmed by this court on direct appeal. *United States v. McDonald,* 576 F.2d 1350 (9th Cir.), *cert. denied,* 439 U.S. 830 & 927, 99 S.Ct. 105 & 312, 58 L.Ed.2d 124 (1978). He was fined $1,000 and sentenced to five years' imprisonment on each count, two of which were to run consecutively, for a total sentence of ten years. On September 12, 1978, the district court reduced this sentence to five years, on Baumann's motion pursuant to Fed.R.Crim.P. 35, by ordering that the sentences on all four counts run concurrently. More than two years later, Baumann, acting *in propria persona,* petitioned the district court for postconviction relief, seeking to have his sentence vacated or set aside pursuant to 28 U.S.C. § 2255. The district judge referred the petition to a magistrate, who recommended that the petition be dismissed because section 2255 "does not permit a party to relitigate issues that were or could have been raised on direct appeal." On April 27, 1981, the district judge ordered the petition dismissed. This appeal followed.

Because they are relevant to his allegation of newly discovered evidence, we must review the complex set of facts that led to Baumann's conviction. *See United States v. McDonald, supra,* 576 F.2d at 1352–53. Hood formed Western in 1966 to purchase and sell subdivision real estate lots on contract, with title remaining with the original owner in trust until a "release price" was paid by Western. Bankers Finance & Holding Co. (Bankers), owned by Baumann, marketed the land sale contracts held by Western on a commission basis. Bankers would sell the contracts at a discounted value to investors, forward the receipts to Western, and then collect periodic contract payments from the lot buyers and forward these to the investors who had purchased the contracts. McDonald Investment Co., owned by Baumann's co-defendant McDonald, also brokered land sale contracts for Western.

Subsequently, Western entered into several subdivision agreements under which it was required to make periodic payments to the owner-trustees irrespective of lot sales. As a result, its cash-flow needs steadily increased. When Western's revenues from the sale of legitimate contracts proved insufficient to cover operating expenses, it began the fraudulent practices that led to the federal indictments. Hood and Western would write spurious land sale contracts to persons who were not expected to make payments on them, or would, in a few instances, forge signatures on the contracts. These so-called "fenceposted" contracts were then marketed to investors or pledged as security for loans to Western. To conceal the fraud, Western supported the fenceposted contracts by making the requisite periodic payments on them, which were sent to Central Service Bureau (CSB), an agent of Western employed to collect payments on contracts sold to investors, and allegedly also to Bankers. The brokers would forward the receipts to the investors who had purchased the contracts. These investors were not notified when Western was making payments on a contract, whether Western did so to cover a fenceposted contract or because of the default of the primary obligor, the lot buyer.

Western's financial success depended upon the continuing brisk sale of contracts,

whether legitimate or fenceposted, because these receipts covered the periodic payments Western was making on bogus contracts. Sales were too slow to support the fraud, however. In August of 1973, the operation collapsed when Western defaulted on corporate notes it had sold secured by first mortgages on real estate held in trust. Few of the note holders were able to obtain their lots, and many investors who had purchased land sale contracts discovered they were holding worthless paper.

Baumann, as president of Bankers, was a natural focus of the grand jury's inquiry. Nonetheless, he was named in only four of the fifty-five counts in the indictment. Two of the counts, Nos. 26 and 27, charged Baumann with mailing checks to investors in furtherance of the fenceposting scheme. The funds for these checks were allegedly supplied by Western. The third count, No. 28, charged Baumann with mailing a letter to investor Anderson; the letter notified Anderson of the default on his contract on which Baumann had allegedly altered the legal description of the underlying real estate. The final count, No. 29, charged Baumann with mailing a letter to Western "dunning" Western for payments on allegedly fenceposted contracts. All four counts charged Baumann with conduct knowingly in furtherance of the fraudulent scheme, and aiding and abetting, between March 5, 1972, and July 26, 1973.

Baumann never contested the acts of mailing these letters, but rather insisted that there was no proof that the acts were undertaken in furtherance of the fenceposting scheme. Proof that the mailings were in furtherance of a scheme to defraud was clearly an essential element of the crime necessary to sustain Baumann's conviction under the indictment. *United States v. McDonald, supra,* 576 F.2d at 1360 n.16. According to Baumann, the contracts underlying Counts 26 and 27 were good contracts, not fenceposted contracts, and any problems experienced by the investors who had purchased these contracts occurred well af-

ter he had sold Bankers to another company. He contends that the altered description of the real estate underlying the contract involved in Count 28 was the product of Western's activities, of which he had no knowledge. Finally, he asserts that the "dunning" letter, the subject of Count 29, was mailed to Western in accordance with a "recourse" agreement between Western and Bankers, rather than in furtherance of the fenceposting scheme. Little, if any, direct evidence of Baumann's involvement in the fenceposting scheme was presented to the jury. His conviction was sustained on the basis of circumstantial evidence of intent to defraud, including his status as a broker for Western's contracts and testimony that he had previously been involved in other fenceposting schemes. *United States v. McDonald, supra,* 576 F.2d at 1360 & n.17.

McDonald, also a broker for Western's contracts, was convicted on seven counts of mail fraud. He maintained that the evidence did not show participation with intent to defraud, that he marketed the contracts without knowledge of the fraud, and that he was in fact a victim of the scheme. Despite the government's contention that McDonald was aware of the "high probability" that at least some of the contracts he sold were fraudulent, his convictions were reversed on direct appeal because the record did not demonstrate facts from which the jury could have found specific intent to defraud beyond a reasonable doubt. *Id.* at 1358–59.

## II

■ We emphasize at the outset that we need not decide the truth of Baumann's allegations. The petition was dismissed by the district court without an evidentiary hearing. Section 2255 expressly provides that an evidentiary hearing "shall" be granted "[u]nless the motion and the files and records of the case *conclusively show that the prisoner is entitled to no relief.*" 28 U.S.C. § 2255 (emphasis added).[1] Obvi-

1. 28 U.S.C. § 2255 provides in part:
 Unless the motion and the files and records of the case conclusively show that the prison-

er is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing

ously, a hearing is not automatically required on every section 2255 petition. *Coco v. United States,* 569 F.2d 367, 369 (5th Cir. 1978). Nonetheless, a hearing is mandatory whenever the record does not affirmatively manifest the factual or legal invalidity of the petitioner's claims. *See Sosa v. United States,* 550 F.2d 244, 250 (5th Cir. 1977). Mere conclusory statements by the petitioner do not justify a hearing. *Wagner v. United States,* 418 F.2d 618, 621 (9th Cir. 1969). On the other hand, the petitioner need not detail his evidence, but must only make specific factual allegations which, if true, would entitle him to relief. *United States v. Hearst,* 638 F.2d 1190, 1194–95 (9th Cir. 1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981). A hearing must be ordered unless, viewing the petition against the record, its allegations do not state a claim for relief or are so palpably incredible or so patently frivolous or false as to warrant summary dismissal. *See Blackledge v. Allison,* 431 U.S. 63, 76, 97 S.Ct. 1621, 1630, 52 L.Ed.2d 136 (1977) (§ 2254 petition); *Machibroda v. United States,* 368 U.S. 487, 495–96, 82 S.Ct. 510, 514–515, 7 L.Ed.2d 473 (1962); *United States v. Malcolm,* 432 F.2d 809, 812 (2d Cir. 1970); *Young Hee Choy v. United States,* 344 F.2d 126, 127–28 (9th Cir. 1965).

■ In addition, the petition in this case was denied without ordering a response from the government. This is permitted by rule 4(b) of the Rules Governing Section 2255 Proceedings [2] only "[i]f it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled

to relief . . . ." 28 U.S.C. foll. § 2255. Our review, therefore, is limited to whether the district court's summary dismissal of Baumann's petition was proper. We must remand for responsive briefing and an evidentiary hearing if the record in this case does not "conclusively" or "plainly" show that Baumann was entitled to no relief.

### III

■ Baumann claims that the indictment under which he was charged was invalid because it was improperly drawn. The district court reached the merits of this claim. The court rejected Baumann's multiplicity argument because each of the four counts charged Baumann with a separate violation of the mail fraud statute. Similarly, the court rejected the duplicity argument because the essence of Baumann's claim, that he had also been charged with a "scheme or artifice to defraud" in Count 1 of the indictment, was incorrect. Early in the trial it was stipulated between Baumann's counsel and the government that Baumann was not charged with a substantive offense under Count 1; the references to Count 1 in the counts of the indictment under which he was charged were references which incorporated only the factual allegations of Count 1. Thus, because the aiding and abetting statute, 18 U.S.C. § 2, provides a means of establishing liability but does not itself define a crime, *see, e.g., United States v. Cowart,* 595 F.2d 1023, 1031 n.10 (5th Cir. 1979), the counts charging Baumann with both aiding and abetting and mail fraud were not duplicitous. *See, e.g., United*

thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or [is] otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

2. Rule 4(b) provides in part:

If it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the movant to be notified. Otherwise, the judge shall order the United States Attorney to file an answer or other pleading within the period of time fixed by the court or to take such other action as the judge deems appropriate.

*States v. Peterson,* 524 F.2d 167, 174 (4th Cir. 1975), *cert. denied,* 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976).

█ We are also free to review the merits of this claim. Generally, an attack on the validity of an indictment is not properly raised collaterally pursuant to section 2255 absent a showing of "cause" why the claim was not raised before trial. *United States v. Zazzara,* 626 F.2d 135, 137 (9th Cir. 1980). However, "cause" may be demonstrated where the allegation is that the indictment's validity was not challenged before trial because of the ineffective assistance of the defendant's counsel. *Id.; cf. Garrison v. McCarthy,* 653 F.2d 374, 378 (9th Cir. 1981). In this case, Baumann has alleged that his counsel rendered constitutionally ineffectively assistance because he "fail[ed] to move for a dismissal of arguably duplicitous counts," as in *Ewing v. Williams,* 596 F.2d 391, 393 (9th Cir. 1979). Nonetheless, when such a claim of ineffective assistance of counsel "rests upon specific acts and omissions of counsel at trial, . . . relief will be granted only if it appears that the defendant was prejudiced by counsel's conduct." *Cooper v. Fitzharris,* 586 F.2d 1325, 1331 (9th Cir. 1978) (en banc), *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979). Baumann could not conceivably have been prejudiced by his counsel's failure to move for dismissal of any of the counts of the indictment because, as the district court concluded, they were not defective as a matter of law. The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel. Since the record demonstrated conclusively that Baumann's allegations failed to state a claim for relief, it was not error for the district court to dismiss this portion of the petition without ordering an evidentiary hearing.

## IV

█ Baumann alleged in his section 2255 petition that the government unconstitutionally failed to disclose exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (*Brady*). If this allegation were true, it could establish a violation of due process and thus an error of constitutional dimension justifying postconviction relief under section 2255. *Levin v. Katzenbach,* 363 F.2d 287, 290 (D.C.Cir.1966). Baumann argued to the district court that the prosecutor knew that the investors who testified against him had received periodic contract payments from the lot buyers themselves, rather than fraudulent payments supplied by Western, and that the prosecutor failed to disclose this to the jury. Reading this allegation liberally, as we must when *pro se* complaints are involved, *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–596, 30 L.Ed.2d 652 (1972), it is an allegation that the prosecution withheld material, exculpatory evidence from the defense. The district court rejected this claim, apparently because Baumann had not made a sufficient "affirmative" showing justifying relief. The court concluded:

> This allegation is made upon information and belief and points to nothing concrete. Instead, in maintaining his innocence, the defendant cannot accept the fact that the Government presented the "whole" case. Without an argument based in fact, this Court is unable to join in the speculation upon which the defendant bases his position.

█ The government relies on *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), in support of the district court's conclusion that Baumann had failed to make a sufficient affirmative showing to justify relief. However, *Agurs* decides only the standard of materiality applicable to undisclosed exculpatory evidence; it does not determine the petitioner's burden of production. Baumann has not alleged that the government knowingly relied on perjured testimony or that it ignored a specific pretrial request for discovery materials. Therefore, failure to disclose the allegedly exculpatory evidence would be a violation of due process only if, in the context of the entire record, the omitted evidence would have created a reasonable doubt that otherwise did not exist. *Id.* at 112, 96 S.Ct. at 2401.

This is not the type of claim that can ordinarily be decided on a section 2255 petition without an evidentiary hearing. Evidence showing that the contracts involved in Counts 26 and 27 were legitimate contracts, and not fenceposted contracts, would clearly have created a reasonable·doubt as to Baumann's guilt because the prosecution's case rested largely upon the proposition that the contracts Baumann brokered for Western were fenceposted. Only if the record "conclusively" demonstrated the lack of merit of this claim was the district court correct in dismissing it without ordering an evidentiary hearing. While the government correctly insists that Baumann has not shown that any *Brady* material was in fact suppressed, Baumann's claim is not so patently frivolous or incredible as to justify summary dismissal. He has not made a conclusory allegation, but rather has specifically identified the exculpatory evidence which he claims the government knew of and failed to disclose. *See United States v. Donn,* 661 F.2d 820, 825 (9th Cir. 1981) (per curiam). There is nothing in the record which conclusively demonstrates that this claim was without merit. Therefore, we reverse the summary dismissal of this portion of the petition and remand for an evidentiary hearing.

In his brief on appeal, Baumann has included a letter from the Cauffmans, dated September 19, 1972, inquiring as to whether they should send their periodic contract payments to CSB or Bankers. He also includes a letter, dated October 6, 1972, from Western to the Cauffmans, instructing them to make their payments to CSB, which would then forward the payments to Bankers. Baumann alleges in his brief that at the time of trial the prosecution had in its possession both these letters, which allegedly demonstrate that the contract underlying Count 26 was legitimate. Baumann did not include these letters in his section 2255 petition, nor did he make this argument to the district court. We need not entertain arguments that are raised for the first time on appeal. *Marshall v.` United States,* 465 F.2d 966, 967–68 (9th Cir. 1972) (per curiam). On remand, Baumann should be permitted to present the issue of whether the prosecution had these letters in its possession before trial and unconstitutionally failed to disclose them to the defense.

### V

Baumann raises several claims of error with respect to his sentencing. First, he claims that a "presentence report" written by an Assistant United States Attorney was not disclosed to him or his attorney, in violation of Fed.R.Crim.P. 32(c)(3)(A).[3] The report concluded: "Baumann will never be rehabilitated and can be considered a sure candidate to continue in fraud if released. Parole is not recommended." The district court ruled that rule 32(c)(3) had not been violated, since this so-called presentence report had never been presented to the court. The court observed that the report was not a presentence report, but rather a communication directed to the Parole Commission.

Baumann does not allege on appeal that the report in question was ever "submitted to the court" within the meaning of rule 32(c)(1). While it is true that the defendant is entitled to be "apprised in ·

---

**3.** Fed.R.Crim.P. 32(c) provides in part:

(1) *When Made.* The probation service of the court shall make a presentence investigation and report to the court before the imposition of sentence ... unless, with the permission of the court, the defendant waives a presentence investigation and report ....

The report shall not be submitted to the court or its contents disclosed to anyone unless the defendant has pleaded guilty ... or has been found guilty, except that a judge may, with the written consent of the defendant, inspect a presentence report at any time.

. . . .

(3) *Disclosure.*

(A) Before imposing sentence the court shall upon request permit the defendant, or his counsel if he is so represented, to read the report of the presentence investigation exclusive of any recommendation as to sentence .... [T]he court shall afford the defendant or his counsel an opportunity to comment thereon and, at the discretion of the court, to introduce evidence or other information relating to any alleged factual inaccuracy contained in the presentence report.

detail of the nature of adverse information on which the trial court relied in passing sentence," *United States v. Perri,* 513 F.2d 572, 575 (9th Cir. 1975), a report need not be disclosed pursuant to rule 32(c)(3)(A) if it is never submitted to the district court or relied on at all by the court in imposing sentence. Since, as a matter of law, this report need not have been disclosed to him prior to sentencing, Baumann's petition conclusively showed he was not entitled to relief on this claim. It was therefore not error to dismiss this portion of the petition without ordering an evidentiary hearing.

■ Next, Baumann raised a variety of claims before the district court which the court rejected with little or no discussion. Baumann sought a reduction of sentence on the ground of disparity between his sentence and those imposed on his co-defendants, and for leniency because of age, chronic arthritis and stomach problems. He asked the district court to expunge from his record the language in the Assistant United States Attorney's report relating to his potential for rehabilitation on the ground that it was unfair, self-serving, and prejudicial. Finally, he asked that his sentence be vacated because he allegedly was not given an opportunity to address the court on his own behalf at sentencing or to present information in mitigation of punishment, pursuant to Fed.R.Crim.P. 32(a)(1), and because of misinformation allegedly provided to the court by the prosecution prior to sentencing. *See United States v. Fatico,* 458 F.Supp. 388, 396–98 (E.D.N.Y.1978), *aff'd,* 603 F.2d 1053 (2d Cir. 1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980). Baumann has preserved none of these issues on appeal, and we therefore do not address them.

Baumann's most serious challenge to his sentencing relates to his interview with a probation officer. Baumann alleged in his petition that this interview occurred after he was convicted and that the results of this interview, in terms of the inferences drawn from it by the probation officer, were provided to the district judge for his use in imposing sentence. He maintained that in the absence of his attorney, this interview violated his sixth amendment right to counsel and that it constituted custodial interrogation prior to which he should have been given the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (*Miranda*). Baumann relied primarily upon *Smith v. Estelle,* 602 F.2d 694 (5th Cir. 1979), a case subsequently affirmed by the Supreme Court. *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (*Estelle*). The district court rejected this claim without any substantial discussion of the difficult constitutional issues presented:

It is the understanding of this Court that the assistance of counsel and the giving of the *Miranda* warnings are measures taken to guarantee and effectuate a defendant's right to a fair trial and right not to incriminate himself. How these liberties are fostered by providing what the defendant has demanded after conviction is not clear. In any case, such novel arguments are better directed to an appellate court, as this court is bound to follow existing law.

■ We do not fault the district court for summarily rejecting this claim. Its order dismissing the petition was entered on April 23, 1981, nearly a month before the Supreme Court's decision in *Estelle.* At that time, neither the Supreme Court nor this court had construed either the fifth or sixth amendments to provide presentence rights to convicted defendants at all similar to those ultimately announced in *Estelle.* However, we are to apply the law, including intervening decisions of the Supreme Court, which is in effect at the time we render our decision, unless "manifest injustice" would result. *Bradley v. School Board,* 416 U.S. 696, 715–17, 94 S.Ct. 2006, 2018–2019, 40 L.Ed.2d 476 (1974); *Monti v. Department of Industrial Relations,* 582 F.2d 1226, 1228 (9th Cir. 1978). The record in this case is sufficient for our decision, which involves a freely reviewable question of law. Neither party has asked us to remand this case to the district court for reconsideration in light of *Estelle.* Therefore, we exercise our

discretion and decide the constitutional issues raised in Baumann's petition. Since these claims were dismissed without an evidentiary hearing, we assume, as we must, the truth of all nonfrivolous factual allegations made in the petition.

In *Estelle,* the defendant submitted to a psychiatric examination prior to his state court trial on charges of murder. Under state law, murder is a capital offense requiring bifurcated proceedings—a guilt phase and a penalty phase. Once a defendant is convicted by the jury in the guilt phase, a separate proceeding before the same jury is held to fix the punishment. At the penalty phase, if the jury affirmatively answers three questions, the judge *must* impose the death sentence. One of these questions concerns the defendant's future dangerousness. 451 U.S. at 457–58, 101 S.Ct. at 1870–1871. The state was allowed to introduce testimony by a psychiatrist who had conducted a pre-trial examination of the defendant. The psychiatrist concluded that the defendant was a "very severe psychopath" with "no remorse or sorrow for what he has done," and that, in essence, the defendant would be a dangerous threat to society in the future if not executed. *Id.* at 459–60, 101 S.Ct. at 1871–1872. The Supreme Court, limiting its inquiry to "the circumstances of th[e] case," *id.* at 461, 101 S.Ct. at 1872, observed that the dangerousness question was "a critical issue at the sentencing hearing" and one "on which the State ha[d] the burden of proof beyond a reasonable doubt." *Id.* at 466, 101 S.Ct. at 1875. The Court concluded that the failure to provide the defendant with *Miranda* warnings prior to the interview, or to notify the defendant's counsel in advance as to the scope of the interview and allow counsel to advise the defendant as to "the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed," *id.* at 471, 101 S.Ct. at 1877, violated *Miranda* as well as the defendant's sixth amendment right to counsel.

Baumann urges us to extend *Estelle* to the facts of this case. Reading his

allegations liberally, his claim is that he insisted during the interview with the probation officer that he was innocent of the crimes for which he was convicted, and that the probation officer interpreted this profession of innocence as a lack of remorse upon which he justified a recommendation to the sentencing judge to "aggravate" the sentence imposed. This allegation has some similarity to the one advanced in *Estelle.* We first examine the *Miranda* question.

The government argues that *Miranda,* as interpreted in *Estelle,* is not applicable to this case because the information procured by the probation officer was not used to establish Baumann's guilt, but rather only to determine his sentence. While this argument is plausible, it was unmistakably rejected by the Court in *Estelle.* Citing *In re Gault,* 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967) ("the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding ... but upon the nature of the statement ... and the exposure which it invites"), the Court held:

> We can discern no basis to distinguish between the guilt and the penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned. Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees.... Any effort by the State to compel respondent to testify against his will at the sentencing hearing clearly would contravene the Fifth Amendment. Yet the State's attempt to establish respondent's future dangerousness by relying on the unwarned statements he made to [the psychiatrist] similarly infringes Fifth Amendment values.

451 U.S. at 462–63, 101 S.Ct. at 1872–1873 (footnotes and citations omitted). There is no question in this case but that the questioning of Baumann by the probation officer constituted "interrogation" within the meaning of *Miranda. See United States v. Booth,* 669 F.2d 1231, 1237–38 (9th Cir. 1981). The government argues, however,

that Baumann was not in "custody" at the time of the presentence interview because he had been released on his own recognizance pending sentence. We need not, and cannot, decide this question in view of the record presented.[4] But even assuming that Baumann was in custody at the time of the interview, we hold that neither *Estelle* itself, nor the general principles announced in *Miranda,* require that a convicted defendant be warned of his right to counsel and his right to remain silent prior to submitting to a routine, authorized presentence interview.

We believe it appropriate to read *Estelle* narrowly. This is not a bifurcated jury proceeding involving the potential of the ultimate penalty, death. Nor is the question of "remorse" which Baumann raises nearly as critical an issue in this case as was the question of future dangerousness in *Estelle.* In order to impose the death sentence, the state in *Estelle* was required to demonstrate the existence of certain aggravating factors by proof beyond a reasonable doubt. *See Jurek v. Texas,* 428 U.S. 262, 268–76, 96 S.Ct. 2950, 2954–2958, 49 L.Ed.2d 929 (1976) (plurality opinion). There is no similar requirement in the sentencing phase of a trial under the federal mail fraud statute, a noncapital proceeding conducted before the district court and not a jury. We conclude that there is a substantial difference between a psychiatric examination of the defendant in a capital case which seeks to elicit evidence from the defendant relating to the critical aggravating factor of dangerousness, and a "routine" presentence interview, *see Estelle, supra,* 451 U.S. at 465, 101 S.Ct. at 1874, restricted to gathering information upon which the district court, in its discretion, may rely when imposing sentence. As we read *Estelle,* the Court's fifth amendment holding is limited

to the distinct circumstances of the bifurcated capital proceedings presented in that case. *Id.* at 465, 101 S.Ct. at 1874. The Court expressly cautioned that it did "*not* hold that the same Fifth Amendment concerns are necessarily presented by all types of interviews and examinations that might be ordered or relied upon to inform a sentencing determination." *Id.* at 469 n.13, 101 S.Ct. at 1876 n.13 (emphasis added). *Estelle,* therefore, does not support Baumann's argument.

We must decide this issue by reference to the general purposes and policy of the *Miranda* decision. Ordinarily, custodial interrogation of a suspect is impermissible in the absence of the warnings directed by *Miranda.* *See Beckwith v. United States,* 425 U.S. 341, 345–47, 96 S.Ct. 1612, 1615–1616, 48 L.Ed.2d 1 (1976). However, *Miranda* has never been applied, to our knowledge, to routine presentence interviews conducted for the benefit of a district judge in the exercise of his substantial discretion at sentencing. We see no reason to do so. As we observed recently:

> *Miranda* was, and remains, a prophylactic device designed to protect the exercise of Fifth Amendment rights by criminal defendants. Absent procedural safeguards, custodial interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona,* . . . .

*United States v. Booth, supra,* 669 F.2d at 1237. The *Miranda* safeguards, therefore, cannot be divorced from the practical concerns and policy considerations which gave rise to that seminal decision. *See Beckwith v. United States, supra,* 425 U.S. at 345–48, 96 S.Ct. at 1615–1617. Custodial interroga-

---

4. "Custody" for *Miranda* purposes is essentially a *factual determination made after an analysis of the totality of circumstances involved in a given case. United States v. Booth,* 669 F.2d 1231, 1235–36, (9th Cir. 1981). Baumann apparently claims that he was in custody either (1) because he had been convicted, or (2) because he had been remitted to the custody of the Attorney General pending sentencing. If, as the government claims, Baumann was re-

leased on his own recognizance pending sentencing, that would be a significant factor in determining whether a reasonable person in Baumann's position would have felt that, under the circumstances, he was in custody because he was not free to leave the interview. Since no evidentiary hearing was held on this issue, however, it would be improper for us to decide it.

tion cannot be used as a talismanic substitute for a searching inquiry into the inherently compelling pressures which may or may not exist in a specific type of confrontation between a suspect and law enforcement authorities. Indeed, the Supreme Court has forcefully warned:

> [T]he right to silence described in [the *Miranda*] warnings derives from the Fifth Amendment and adds nothing to it. *Although* Miranda's *requirement of specific warnings creates a limited exception to the rule that the privilege must be claimed, the exception does not apply outside the context of the inherently coercive custodial interrogations for which it was designed.* The warnings protect persons who, exposed to such interrogation without the assistance of counsel, otherwise might be unable to make a free and informed choice to remain silent.

*Roberts v. United States,* 445 U.S. 552, 560–61, 100 S.Ct. 1358, 1364–1365, 63 L.Ed.2d 622 (1980) (emphasis added).

Even assuming a technically custodial interrogation in the circumstances of this case, it was not the type of situation in which *Miranda* warnings are required in order to effectuate the exercise of the fifth amendment privilege. Baumann does not argue, nor is there any indication in the record, that the exercise of his fifth amendment right to silence was burdened, fettered, or impaired in any manner. There is no claim that his statements to the probation officer were involuntary in the constitutional sense. Indeed, Baumann testified to his complete innocence at trial, and merely reiterated those statements during the presentence interview. Nothing in the record suggests that this presentence interview or, more importantly, presentence interviews in general, entail pressures at all similar to those "which the *Miranda* Court found so inherently coercive as to require its holding." *Beckwith v. United States, supra,* 425 U.S. at 347, 96 S.Ct. at 1617. To require *Miranda* warnings before such routine presentence interviews, therefore, would be to apply a principle "broader than that required to implement the policy of *Miranda* itself." *United States v. Booth,*

*supra,* 669 F.2d at 1237. We decline to do so. If we were to set aside Baumann's sentence on the record before us, we would "sanction an unwarranted interference with a function traditionally vested in the trial courts." *Roberts v. United States, supra,* 445 U.S. at 561, 100 S.Ct. at 1365.

The Court in *Estelle* also ruled that the psychiatric examination involved in that case violated the defendant's sixth amendment right to counsel because it was a "critical stage" of the proceeding in which he was not "given prior opportunity to consult with counsel," 451 U.S. at 470 n.14, 101 S.Ct. at 1877 n.14, and was "denied the assistance of his attorneys in making the significant decision of whether to submit to the examination...." *Id.* at 471, 101 S.Ct. at 1877. This brief portion of the Court's opinion is apparently based upon the sixth amendment right to counsel which inheres in post-indictment questioning initiated by law enforcement authorities. *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), provides a right to the *presence* of counsel during postindictment confrontations with the government in which the government "deliberately elicits" incriminating statements from the accused. The Court's citations to *Massiah, United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), and *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), suggest that the Court applied a modified version of the *Massiah* right to the pretrial, post-indictment psychiatric interview before it, because the Court concluded that such an interview, at least in a bifurcated capital proceeding, is a "critical stage" of the proceeding in which the prior advice of counsel is essential to guarantee the fairness of the trial itself within the rule of *United States v. Wade.*

We understand the sixth amendment portion of *Estelle,* therefore, to be consistent with the general principle that the right to counsel attaches upon the commencement of adversary proceedings and applies to any critical stage of those proceedings where counsel's absence, or lack of advice, might

derogate from the accused's right to a fair trial. Clearly, denying the defendant in *Estelle* the assistance of counsel with respect to his responses to questions that would be used in order to prove, beyond a reasonable doubt, the critical aggravating factor of dangerousness, impaired the fairness of the jury trial itself. In those bifurcated proceedings, it is the jury which must decide whether the state has proved its case in the sentencing phase of the trial. If it decides that the state has, the judge *must* impose the death sentence. Thus, the Court was justified in concluding that the defendant's "interview proved to be a 'critical stage' of the aggregate proceedings against [him]." 451 U.S. at 470, 101 S.Ct. at 1877.

 Because the sentencing phase of the noncapital case before us does not involve an issue which is nearly as critical as was the issue of dangerousness in *Estelle,* the presentence interview was not a "critical stage" of the aggregate proceedings against Baumann. *See Lockett v. Ohio,* 438 U.S. 586, 604–05, 98 S.Ct. 2954, 2964–2965, 57 L.Ed.2d 973 (1978) (in noncapital cases, individualized sentencing procedures stem from public policy enacted into statutes, rather than the Constitution). Even if, as Baumann alleges, the probation officer recommended an aggravated sentence to the district judge because of the lack of remorse which he gathered from Baumann's responses during the interview, the district judge was not required to impose the maximum sentence or even the recommended sentence. A district judge has wide discretion in determining the appropriate sentence to be imposed. *United States v. De-Wald,* 669 F.2d 590, 592 (9th Cir. 1982). He may consider all relevant facts in the defendant's personal history and occupation, *United States v. Beecroft,* 608 F.2d 753, 762 (9th Cir. 1979), and may also consider evidence which would be inadmissible at the trial itself. *United States v. Larios,* 640 F.2d 938, 942 (9th Cir. 1981). Therefore, although Baumann may have been denied the advice of his attorney in making the

"significant decision of whether to submit to the [interview]," *Estelle,* 451 U.S. at 470, 101 S.Ct. at 1877, any such denial was constitutionally insignificant. We hold that a routine presentence interview of an individual convicted of a noncapital federal offense is not, under *Estelle* and *United States v. Wade,* a critical stage of the proceeding in which counsel's presence, or advice, is necessary to protect the defendant's right to a fair trial.

## VI

Baumann also contends that the district judge erred in failing to order an evidentiary hearing on his claim of "newly discovered evidence." In an appendix to his section 2255 petition filed with the district court, Baumann presented the following: (1) a letter from Hood, in which Hood stated that all the contracts purchased by Bankers in 1972 "were in fact good contracts" and that Baumann "could not have had any knowledge [of] fenceposted contracts during that time as he was not purchasing any"; that the changes in the legal description of the land in "the Russell contract," the subject of Count 28, were "made without the knowledge" of Baumann and that Baumann was not notified of these changes; and that "[a]ny contracts that [Baumann] purchased were with a guarantee by WLSCO [Western] to make any and all delinquent payments and to collect for themselves from the land buyer"; (2) a letter from Berkenkamp, the purchaser of the contract involved in Count 27, stating that the lot buyer "had paid off the contract and had a clear title to the property"; and (3) a payment record from Reinken, the lot buyer on the contract involved in Count 27.

The magistrate concluded that the allegations of new evidence could not be reviewed since a motion for a new trial would not be timely under Fed.R.Crim.P. 33,[5] and allegations of new evidence are not cognizable in a collateral proceeding under section 2255. Baumann objected to this recommendation, citing cases from the Eighth and Tenth

---

5. "A motion for a new trial based on the ground of newly discovered evidence may be

made only before or within two years after final judgment . . . ." Fed.R.Crim.P. 33.

Circuits [6] which hold that claims of newly discovered evidence are proper under section 2255. The district court accepted the magistrate's recommendation and denied the petition. The district judge agreed that Baumann had "alleg[ed] facts which should provide the basis for a new trial." However, the district court held that (1) section 2255 does not allow relitigation of the petitioner's guilt or innocence; [7] (2) even if newly discovered evidence bearing upon that question were cognizable in a section 2255 proceeding, the new evidence Baumann presented did not justify postconviction relief because it would not "probably produce an acquittal"; and (3) because Baumann had failed to present any new evidence relating to Count 29, the "concurrent sentence doctrine" permitted the court to avoid reviewing the convictions under the other counts.

We need not decide whether the district judge was correct in his reasons for this holding because we reverse on a different ground. The necessary predicate to Baumann's argument is that the evidence he presented in his petition to the district court was "newly discovered." However, each piece of evidence he relied on relates directly to arguments which his counsel made to the jury in his opening and closing statements and which Baumann testified to on direct examination. Baumann's defense was that the contracts underlying Counts 26 and 27 were in fact good contracts, and not fenceposted contracts, because actual lot buyers existed who had signed the contracts and were making the requisite periodic payments on them.[8] His defense to the charge involved in Count 28 was that the letter to Anderson merely notified him of a default on his contract and that Baumann had no knowledge of any alteration in the legal description of the underlying real estate. Similarly, his defense to the charge involved in Count 29, the "dunning letter" sent to Western, was that the letter was sent in accordance with a recourse agreement entered into between Western and

**6.** *Lindhorst v. United States,* 585 F.2d 361, 365 & n.8 (8th Cir. 1978); *Anderson v. United States,* 443 F.2d 1226, 1227 (10th Cir. 1971) (per curiam). *See also Silverman v. United States,* 556 F.2d 655 (2d Cir.) (by implication), *cert. denied,* 434 U.S. 956, 98 S.Ct. 484, 54 L.Ed.2d 315 (1977); *Morgan v. United States,* 438 F.2d 291 (5th Cir. 1971).

**7.** The district court, and the government on appeal, rely solely on *Hill v. United States,* 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), for the proposition that the guilt or innocence of the petitioner is not at issue in a section 2255 proceeding. However, *Hill* holds only that non-constitutional errors are cognizable under section 2255 only if the error is a "fundamental defect which inherently results in a complete miscarriage of justice," or if "exceptional circumstances" warrant collateral relief. *See Davis v. United States, supra,* 417 U.S. at 346, 94 S.Ct. 2298 at 2305, 41 L.Ed.2d 109. Some cases suggest the district court may be correct. *See Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963); *Anderson v. Maggio,* 555 F.2d 447, 451 (5th Cir. 1977); *Clark v. United States,* 370 F.Supp. 92, 95 (W.D.Pa.), *aff'd mem.,* 506 F.2d 1050 (3d Cir. 1974). Others suggest the contrary. *See Anderson v. United States, supra,* 443 F.2d at 1227. Indeed, Justice Powell and Judge Friendly have proposed that collateral attack should be limited *only* to questions of guilt or innocence. *Schneckloth v. Bustamonte,* 412 U.S.

218, 257, 265–66, 93 S.Ct. 2041, 2063, 2067–2068, 36 L.Ed.2d 854 (1973) (Powell, J., concurring); Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,* 38 U.Chi.L.Rev. 142, 160 (1970). In view of our disposition of Baumann's ineffective assistance of counsel claims, *infra,* we need not decide this significant issue.

**8.** In closing argument, the Assistant United States Attorney stated that Baumann's conduct in selling the contracts underlying these two counts was fraudulent because (1) the investor who purchased the contract in Count 26 did not know that the lot involved was subject to a mortgage, and (2) the lot involved in Count 27 was never released from trust. Baumann argues that there is no evidence in the record supporting these claims. He has presented evidence on appeal which suggests that neither is accurate. On remand, he should be permitted to argue that if his attorney had rendered competent assistance, he would have interviewed investor Henry (Count 26), investor Berkenkamp (Count 27), and the lot buyers on those contracts, in order to develop the facts necessary to meet these assertions and dispel any adverse inferences drawn by the jury from the testimony of these investors that, after Baumann sold Bankers, they had difficulty receiving payments and securing free title to the lots in question.

Bankers.[9] Berkenkamp, from whom Baumann has apparently elicited statements, which if true, would demonstrate that the contract underlying Count 27 was legitimate, was called as a prosecution witness and was cross-examined by Baumann's counsel during trial. Baumann points to no circumstances suggesting that this evidence could have been discovered before trial. Therefore, because all of the underlying facts relevant to his present allegations of newly discovered evidence were within his knowledge at the time of trial and could have been substantiated with the exercise of reasonable diligence, the evidence is not newly discovered. *See United States v. Conforte,* 624 F.2d 869, 879 (9th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980); *United States v. Ellison,* 557 F.2d 128, 133 (7th Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977); *United States v. Maestas,* 523 F.2d 316, 320 (10th Cir. 1975); *United States v. Bujese,* 371 F.2d 120, 125 (3d Cir. 1967).

■ This does not end our inquiry. Baumann's evidence is not newly discovered because allowing criminal defendants to raise such allegations after a judgment of conviction has been entered and affirmed on direct appeal would permit them to "sandbag" the fairness of the trial by withholding or failing to seek material, probative evidence and later attempting to collaterally attack their convictions under Fed.R. Crim.P. 33 (new trials) or section 2255. *See Wainwright v. Sykes,* 433 U.S. 72, 89–90, 97 S.Ct. 2497, 2507–2508, 53 L.Ed.2d 594 (1977). Yet Baumann has alleged facts which, if true, would establish that this evidence does not qualify as newly discovered because the failure to produce it during trial was the product of constitutionally ineffective assistance of counsel, a separate claim which he also raised in his section 2255 petition.[10] He asserts that his attorney failed to interview several key witnesses against him before trial, told him that neither the attorney nor Baumann was authorized to interview any prosecution witnesses before trial, and warned Baumann against doing so himself. Thus, Baumann contends, his attorney "did not completely understand the case," and could not effectively cross-examine Hood, Berkenkamp, Henry or any of the witnesses against him in order to establish the facts supporting Baumann's substantial defenses. Therefore, Baumann's claim for postconviction relief under section 2255 is, in reality, based not upon an allegation of newly discovered evidence, but rather upon an allegation that his conviction is constitutionally invalid because it was the product of ineffective assistance of counsel. *See United States v. Donn, supra,* 661 F.2d at 824. We have clearly held that defense counsel's failure to interview witnesses that the prosecution intends to call during trial may constitute ineffective assistance of counsel. *Hines v. Enomoto,* 658 F.2d 667, 676 (9th Cir. 1981). *See Cody v. Morris,* 623 F.2d 101, 103 (9th Cir. 1980); *Ewing v. Williams, supra,* 596 F.2d at 396 n.5.

■ On this record, we are unable to determine whether Baumann's allegations are correct. There has been no hearing on Baumann's claim that his attorney failed to interview prosecution witnesses and prevented Baumann from doing so. We can determine, however, that if true, his allegations could establish constitutionally ineffective assistance of counsel and prejudice to his defense. *See Cooper v. Fitzharris,*

9. Baumann also contends on appeal that the mailings involved in Counts 26 and 27 could not serve as the basis for a mail fraud conviction because the checks were payments from legitimate lot buyers, and therefore had to be forwarded pursuant to state law. *See Parr v. United States,* 363 U.S. 370, 391, 80 S.Ct. 1171, 1183, 4 L.Ed.2d 1277 (1960). This is essentially the same argument presented in his so-called newly discovered evidence claims, since it is predicated on the assumption that the contracts involved in these counts were not in fact fenceposted.

10. Baumann alleged these facts in an independent claim of ineffective assistance of counsel. We do not pass on the question of whether the approach we apply in this case, or the similar approach we applied in *United States v. Donn, supra,* is available if a section 2255 petition does not expressly raise a claim of ineffective assistance of counsel.

*supra.* Furthermore, these are clearly not the sorts of allegations which the district court could dismiss solely by reference to the petition and the record in this case. *Compare United States v. Donn, supra,* 661 F.2d at 824–25, *with Rivera v. United States,* 318 F.2d 606, 608 (9th Cir. 1963). The allegations are specific and, viewed against the record, are not so patently frivolous or palpably incredible as to warrant summary dismissal. The record contains no indication that Baumann himself undertook to contact or interview the witnesses in question. *Cf. Hines v. Enomoto, supra,* 658 F.2d at 676. In addition, his claim of ineffective assistance of counsel relates to events which, by definition, occurred outside the trial courtroom. *See Machibroda v. United States, supra,* 368 U.S. at 494–95, 82 S.Ct. at 513–514. Therefore, the district judge could not, from a review of the record or from his own personal recollection of the attorney's conduct during trial, *see Blackledge v. Allison, supra,* 431 U.S. at 74 n.4, 97 S.Ct. at 1629 n.4; *Machibroda v. United States, supra,* 368 U.S. at 495, 82 S.Ct. at 514, conclude that the record "conclusively show[s] that the prisoner is entitled to no relief." 28 U.S.C. § 2255.

We therefore reverse the district court's dismissal of the so-called newly discovered evidence claims and remand for an evidentiary hearing. During this hearing, Baumann should be permitted to demonstrate, if he can, that if his attorney had rendered competent assistance, he would have elicited the evidence which Baumann has presented in his petition, and that the absence of this evidence from his trial prejudiced his defense. In addition, he should be permitted to offer proof supporting his claim that his attorney's failure effectively to cross-examine Rotola and Howard, the witnesses who apparently provided evidence of Baumann's involvement in other alleged fenceposting schemes which were not charged in the indictment, constituted a constitutional violation. As this testimony formed much of the basis for our prior affirmance of Baumann's conviction on direct appeal, *United States v. McDonald, supra,* 576 F.2d at 1360 & n.17, we point out

that this claim of ineffective assistance of counsel is one which is classically cognizable in a section 2255 proceeding.

## VII

We do not direct the district court on remand to grant the relief Baumann seeks. Pursuant to rule 4 of the Rules Governing Section 2255 Proceedings, the district court should first order a response to the petition from the government. In addition, because the record does not conclusively demonstrate that Baumann is entitled to no relief, the district court should then conduct an evidentiary hearing on the facts underlying his claims of ineffective assistance of counsel and prosecutorial suppression of *Brady* material. Following this hearing, the district judge should enter appropriate findings of fact and, if he concludes that a constitutional violation has been established, grant Baumann's petition and order appropriate relief. *See Chandler v. United States,* 401 F.Supp. 658, 659–60 (D.N.J.1975), *aff'd mem.,* 546 F.2d 415 (3d Cir. 1976), *cert. denied,* 430 U.S. 986, 97 S.Ct. 1685, 52 L.Ed.2d 381 (1977).

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

PREGERSON, Circuit Judge, concurring in part in the judgment and dissenting in part:

I agree with the result reached by the majority that the record conclusively shows that the indictment was not defective for duplicity and that the district court, without ordering an evidentiary hearing, properly rejected this claim on the merits.

I concur in Section IV of the majority's opinion, which reverses summary dismissal of that portion of the Section 2255 petition relating to the government's failure to disclose exculpatory evidence as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Section V of the majority's opinion covers certain claims of error asserted before the district court by Baumann with respect to his sentencing. One claim involves a writ-

ten communication made by an Assistant U. S. Attorney to the U. S. Parole Commission. This communication, which was not disclosed to the trial judge before sentencing, is clearly not a report prepared by the court's probation service to which Fed.R. Crim.P. 32(c) applies. Baumann's claim concerning this communication is patently frivolous and was properly subjected to summary dismissal by the district court.

Baumann also argues that his Fifth and Sixth Amendment rights were abridged by the manner in which his presentence interview was conducted. He contends that the interview with the court's probation officer constituted custodial interrogation and that before the interview the probation officer should have given Baumann the warnings mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He also asserts that the absence of his attorney at the interview violated his right to the assistance of counsel.

Contrary to the majority's view, as expressed in Section V, I believe that the sentencing judge should be asked to reconsider these Fifth and Sixth Amendment claims in light of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), decided while the instant case was on appeal to our court. Therefore, I would not actively reach for these constitutional issues but would reverse and remand the matter to the district court for further proceedings.

The Supreme Court in *Estelle* stressed these factors in holding that respondent's Fifth Amendment privilege against compelled self-incrimination was violated:

1. When the trial court ordered a psychiatric interview and examination of Smith to determine his competency to stand trial, he was in custody in the Dallas County Jail. *Id.* at 467, 101 S.Ct. at 1875.

2. When he talked to the psychiatrist, Smith was unaware that his words could be used to assist the prosecution. *Id.* at 466, 101 S.Ct. at 1874.

3. When testifying for the prosecution at the penalty phase on the crucial issue of Smith's future dangerous-

ness, the psychiatrist became "an agent of the State recounting unwarned statements made in a post-arrest custodial setting." *Id.* at 467, 101 S.Ct. at 1875.

Whether these factors or others indicating custodial interrogation existed during Baumann's post-conviction interview by the court's probation officer should await the results of the district court's determination based on an adequate record.

The majority recognizes that the existence of custodial interrogation for *Miranda* purposes depends on the totality of circumstances involved in a given case. Maj. Op. at n.5. It is for this very reason that the majority's formulation of a *per se* rule, Maj. Op., at 575–576, is inappropriate and ill-advised.

The Court in *Estelle* additionally held that respondent Smith was denied his Sixth Amendment right to assistance of counsel before submitting to a pretrial psychiatric interview. The Court emphasized that Smith's lawyers were unaware, until after the interview, that the trial judge had appointed a psychiatrist to examine their client and determine his competency. *Id.* at 458 n.5, 101 S.Ct. at 1871 n.5.

In the instant case, the trial transcript does not show whether defense counsel was present when the trial judge fixed the time for a probation and sentence hearing and directed Baumann to report to the probation officer. Nor does the transcript indicate what legal advice, if any, Baumann may have received from his counsel in anticipation of the presentence interview by the probation officer, or whether his counsel was present during the interview.

In the past, when faced with similar Fifth and Sixth Amendment issues on a record inadequate for a proper legal decision, instead of announcing a *per se* rule, we have remanded to the district court for an evidentiary hearing to develop a "complete and enlightening ... factual background." *Jones v. Cardwell*, 588 F.2d 279, 281 (9th Cir. 1978), *cert. denied,* 440 U.S. 965, 99

S.Ct. 1513, 59 L.Ed.2d 780 (1979).[1] I think we should follow this prudent course relative to the Fifth and Sixth Amendment issues presented in this case.[2] I discern no compelling reason for us to expatiate on these constitutional issues before they are re-examined by the district judge on the basis of a complete record.

I also disapprove much of the dicta that pervades Section V of the majority's opinion. For example, the majority says that as it reads *Estelle*, "the court's fifth amendment holding is limited to the distinct circumstances of the bifurcated capital proceedings presented in that case." Maj. Op., at 576–577. But the Court did not place any such limitation on its decision when it said: "Of course, we do not hold that the same Fifth Amendment concerns are necessarily presented by all types of interviews and examinations that might be ordered or relied upon to inform a sentencing determination." 451 U.S. at 469 n.13, 101 S.Ct. at 1876 n.13. The Court's words could fairly be read to suggest that under certain circumstances Fifth Amendment concerns may indeed be implicated by a probation officer's presentence interview of a defendant.

The majority seems to suggest that something more than custodial interrogation is necessary before *Miranda* warnings are required to protect a person's Fifth Amendment privilege. Maj. Op., at 576–577. *Miranda*, to the contrary, clearly states that certain prescribed warnings should be given before custodial interrogation takes place. *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612–1613, 16 L.Ed.2d 694 (1966).

The majority also holds "that a routine presentence interview of an individual con-victed of a noncapital federal offense is not ... a critical stage of the proceeding in which counsel's presence, or advice, is necessary to protect the defendant's right to a fair trial"—which I assume includes fair sentencing procedures. Maj. Op., at 578. I disagree with this view. As a practical matter, the presentence interview with the probation officer is an important and critical stage of the proceedings. The results of the interview could have significant effects on the probation officer's recommendations and on the ultimate sentence imposed on the defendant by the court. Defense attorneys worth their salt know the importance of a favorable presentence report and are aware of the necessity of advising and counselling their client before the interview, the results of which might settle the client's fate. *See United States v. Wade*, 388 U.S. 218, 224, 87 S.Ct. 1926, 1930, 18 L.Ed.2d 1149 (1966).

Finally, I concur in the conclusions expressed in Section VI of the majority's opinion. I agree that Baumann's newly discovered evidence claim lacks merit because the underlying facts were within Baumann's knowledge at the time of trial. I also agree that Baumann's ineffective assistance of counsel allegations are not so patently frivolous or palpably incredible as to warrant summary dismissal.

---

1. On remand, the district court held an evidentiary hearing. After finding that the state court had considered evidence obtained in violation of Jones's Fifth and Sixth Amendment rights, the district court granted the petition for habeas corpus. This court agreed that the defendant was entitled to claim the Fifth Amendment privilege at the presentence interview and therefore affirmed the district court's decision. *Jones v. Cardwell*, 686 F.2d 754 (9th Cir. 1982).

2. Several courts have considered the question of the admissibility of extrajudicial statements made by defendants under varying circumstances to their probation or parole officers. *See, e.g., United States v. McKenzie*, 601 F.2d 221 (5th Cir. 1979); *United States v. Johnson*, 455 F.2d 932 (5th Cir.), *cert. denied*, 409 U.S. 856, 93 S.Ct. 136, 34 L.Ed.2d 101 (1972); *People v. Harrington*, 2 Cal.3d 991, 88 Cal.Rptr. 161, 471 P.2d 961 (1970). I would not invade this troublesome area until armed with a complete factual record.